**PHILIPP BROTHERS, INC., Appellant,**

v.

**OIL COUNTRY SPECIALISTS,
LTD., Appellee.**

No. 01–85–01006–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 13, 1986.
Rehearing Denied April 24, 1986.

Carol Vance, Illeana M. Blanco, Bracewell & Patterson, Houston, for appellant.

William E. Junell, Jr., Kay J. Hazelwood, Reynolds, Allen & Cook, Houston, for appellee.

Before DUGGAN, DUNN and LEVY, JJ.

## OPINION

LEVY, Justice.

This is an accelerated appeal from the granting of a temporary injunction in which the trial court enjoined Philipp Brothers, Inc. ("Phibro") from presenting, and Texas Commerce Bank ("TCB") from paying, a $1,516,000 letter of credit until disposition of a suit on a contract.

Oil Country Specialists, Ltd. ("OCS"), has sued Phibro claiming breach of contract, fraudulent inducement of a contract, negligent misrepresentation, and fraudulent presentation against a letter of credit. The claims arose out of a May 29, 1985, consignment contract, in which Phibro agreed to place on consignment with OCS both threaded and unthreaded oil field casing pipe worth approximately $15 million. The proposed inventory consisted of approximately 35,000 tons of pipe. Due to the quantity of pipe and diverse locations, OCS did not inspect the pipe prior to execution of the contract; rather, Phibro's representations about the quality of the pipe were incorporated into the contract. The contract provided that each item in inventory would meet American Petroleum Institute specifications, would be of merchantable quality, and would pass without objection in the trade under descriptions set forth in the contract. OCS was obligated to purchase the pipe only as it made sales to customers. In return, the contract required OCS to pay a "restocking" fee at a rate of 10% per year on that portion of the pipe that remained in inventory and on consignment in the event OCS terminated the consignment agreement or otherwise defaulted on the contract. To secure OCS's payment of the restocking fee, OCS caused TCB to issue the standby letter of credit.

By a June 19, 1985, amendment to the original consignment agreement, which was executed one day before the original contract became effective, Phibro released OCS from any requirement to pay a consignment fee on the threaded pipe in inventory, and Phibro was given the right to sell from the threaded inventory without obtaining OCS's prior approval. Under the amendment, OCS was no longer required to purchase the threaded pipe from the Phibro inventory unless OCS had first determined the threaded pipe to be "merchantable." If OCS determined the threaded pipe to be

merchantable, it was to buy the threaded inventory prior to threading and selling any other similar grade and size plain-end material then in the inventory, and to pay Phibro an "interest payment" in addition to the purchase price of the threaded pipe.

On August 15, 1985, OCS sent Phibro a letter stating its intention to cancel the contract, claiming that Phibro's pipes did not conform to the contract specifications. Phibro responded that it intended to take delivery of the remaining inventory and demanded from OCS $1,659,722.08 (10% of the worth of the remaining inventory) as the restocking fee under the contract. When OCS failed to pay Phibro the restocking fee, Phibro attempted to draw on the letter of credit. OCS filed suit to enjoin Phibro from presenting, and TCB from honoring, the draft. The trial court granted the injunction. Phibro appeals. The letter of credit, originally set to expire on January 31, 1986, has been extended to April 30, 1986.

Essentially, OCS claims that such a substantial portion of the pipe was defective as to amount to fraud in the underlying transaction, and that the legitimate purpose of the contract and letter of credit was destroyed. Phibro claims that the percentage of pipe not accepted is within recognized industry standards, that there is no fraud involved, and that the injunction frustrates the purpose of letters of credit.

In its first point of error, Phibro argues that the trial court abused its discretion in granting a temporary injunction, because there was no showing of fraud as is required under the Texas Uniform Commercial Code for the issuance of a temporary injunction enjoining the presentment and payment of a letter of credit.

■ A "letter of credit" is essentially a promise by the issuing bank to honor upon presentment a draft or demand for payment in order to facilitate a commercial transaction. The Texas Supreme Court has defined a letter of credit as follows:

The engagement is a letter of credit if the issuer has a *primary* obligation that is dependent *solely* upon presentation of conforming documents and not upon the factual performance or nonperformance by the parties of the underlying transaction.

*Republic National Bank v. Northwest National Bank,* 578 S.W.2d 109, 115 (Tex. 1978) (emphasis in original). Thus, the contractual disputes between the customer and the beneficiary usually are not the concern of the issuer. When a draft or demand for payment, which complies with the terms of the relevant letter, is presented, payment should be made. Tex.Bus. & Com.Code Ann. sec. 5.114(a) (Tex. UCC) (Vernon 1968). The UCC does recognize fraud as an exception that allows the issuer to dishonor, or a court to enjoin the honoring of, an otherwise conforming letter of credit. Sec. 5.114(b) (Vernon Supp.1986).

Fraud occurs when a false representation of material fact is made with intent to induce the listener to act upon it and the listener acts in reliance upon the misrepresentation and suffers injury as a consequence. *Gulf Interstate Engineering Co. v. Pecos Pipeline & Producing Co.,* 680 S.W.2d 879 (Tex.App.—Houston [1st Dist.] 1984, writ dism'd); *Hicks v. Wright,* 564 S.W.2d 785, 791 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.). The standard for enjoining a letter of credit is such fraud that destroys the legitimate purposes of the letter of credit's independence from the underlying obligation. *GATX Leasing Corp. v. DBM Drilling Corp.,* 657 S.W.2d 178 (Tex.App.—San Antonio 1983, no writ). In *GATX Leasing Corp.,* the court adopted the standards set out by a New York case as correctly effectuating the purpose of sec. 5–114(b). *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y. S.2d 631 (Supreme Court 1941). In *Sztejn,* the beneficiary had contracted to supply the customer bristles but intended to deliver cowhair, other worthless material, and rubbish. The customer gave advance notice to the bank of the beneficiary's intended deception. The court held that this deception was indeed fraudulent and was not simply a breach of warranty regarding the quality of merchandise. The independence

of the bank's obligations pursuant to the letter of credit, under such fraudulent conditions, should not be extended to protect the unscrupulous seller.

Also cited with approval in *GATX Leasing Corp.* is a Pennsylvania Supreme Court decision that defines the nature of fraud codified under the terms of sec. 5–114(2)(b) as:

> The situation of fraud in which the wrong doing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served.

*Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975).

OCS claims that Phibro's pipe was worthless and accordingly deprived OCS of any contractual benefit. OCS's president testified that Phibro had represented the pipe to be new prime pipe with less than a 2% rejection rate. After the agreement went into effect and trouble with the pipe began to surface, three inspectors were hired to inspect the pipe. Two were hired by OCS, one by Phibro. All three inspectors found rejection rates ranging between 12% and 100% in the threaded pipe, and that the majority of the plain-end pipe required some sort of maintenance and repair before it would be suitable for threading and re-sale. OCS's president testified that pipe represented as prime had been upgraded by third-party processors. He testified that because of the competitive nature of this business, a good reputation and customer satisfaction are critical. In addition, when the rejection rate was as high as in this case, he testified that many customers will return the entire shipment and refuse the order altogether and that this in fact did occur. OCS argues that it was faced with having to physically inspect each piece of pipe prior to sale in order to protect its reputation and customer base. OCS's president testified that customers generally place orders for immediate delivery and cannot wait for the pipe to be repaired. He said OCS was unable to meet its commit-ments to customers out of its inventory and contended that for all practical purposes, the pipe was worthless.

■ The appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order. The merits of the moving party's case are not presented for appellate review. Review of such cases is strictly limited to a determination of whether there has been a clear abuse of discretion by the trial court in granting or denying the interlocutory order. *Davis v. Huey*, 571 S.W.2d 859 (Tex. 1978). At a hearing on a temporary injunction application, the only issue before the trial court is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits. *Diesel Injection Sales & Service, Inc. v. Gonzalez*, 631 S.W.2d 193 (Tex.App.—Corpus Christi 1982, no writ). The appellate court is not to substitute its judgment for that of the trial court, but merely to determine whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion, and the mere fact or circumstance that a trial judge may decide differently than an appellate court would decide does not demonstrate that an abuse of discretion has occurred. *Landry v. Travelers Insurance Co.*, 458 S.W.2d 649, 651 (Tex.1970).

■ Fraud claims should not become surrogates for breach of warranty claims, but Phibro has not demonstrated that the trial judge abused his discretion in granting the temporary injunction. Even disregarding the evidence as to the threaded pipe, there is enough evidence to support a finding that the substandard conditions of the pipe were pervasive enough to render the entire inventory virtually worthless, thus destroying the legitimate purposes of the letter of credit. Accordingly, appellant's first point of error is overruled.

In its second point of error, Phibro contends that OCS did not demonstrate the likelihood of irreparable injury if the injunction was not issued.

In order to obtain a temporary injunction, the party seeking the injunction must show that it has no adequate remedy at law; that it will suffer irreparable harm if the temporary injunction is not granted; that it has a probable right of recovery on the merits of the case; and that the granting of the temporary injunction is necessary to maintain the status quo. *Green v. Stratoflex, Inc.*, 596 S.W.2d 305, 307 (Tex. Civ.App.—Fort Worth 1980, no writ).

The trial court specifically found that OCS had shown each of these four elements. It found that OCS would not have an adequate remedy at law because a monetary judgment will not adequately compensate OCS for the damages that it would sustain. It found that unless the presentment and payment of the letter of credit is enjoined, OCS will suffer immediate and irreparable injury, because if the letter of credit is honored upon presentation, OCS's net worth will be reduced from approximately $3.1 million to approximately $1.6 million. The court further found that this reduction will put OCS in default under the terms of its loan agreement with TCB and its master lease agreement with Tube Finishing and Management Co., Inc., thereby permitting TCB at its option to foreclose its security interest on OCS's inventory, accounts receivable, and equipment, and permitting Tube Finishing to exercise its option to foreclose on its security interests in OCS's property and equipment in Hitchcock, Texas. It also found that there is a reasonable probability that OCS will prevail on the merits at the trial of the case and that the status quo should be maintained pending the final trial on the merits.

After carefully reviewing the record, we find that there is sufficient evidence to support these findings. OCS's president and a TCB officer both testified that OCS's net worth would be significantly reduced if the letter of credit is paid. The net worth of OCS would be reduced such that it would be substantially lower than TCB's loan agreement minimum requirement of tangible net worth. TCB could accelerate the loan, which OCS could

not pay, and initiate proceedings to foreclose its security interest in OCS's equipment, accounts, inventory, and other collateral. Because of a maximum loan limit, if the letter of credit is drawn, it would reduce the amount of available credit from TCB needed to finance further purchases necessary to fulfill OCS's current obligations to customers and replace Phibro's inventory. Also, because of an agreement with Tube Finishing that requires OCS to maintain a certain net worth, a condition of default could exist, and Tube Finishing would be legally entitled to terminate the long-term lease and repossess equipment and property from OCS. Under these circumstances, the trial court was entitled to conclude that OCS showed the likelihood of irreparable injury if a temporary injunction were not to issue.

Appellant's second point of error is overruled.

The order of the trial court is affirmed.